LEIGH M. CLARK, Retired Circuit Judge.
This case is now before this Court on an appeal from a judgment of conviction of the crime of carnal knowledge of a girl under the age of 12 years and a sentence to imprisonment for twenty-five years. The case was before this Court once before on an appeal from the same conviction and sentence, but such appeal was dismissed for its not having been timely filed. It was not filed within the forty-two day time limit. Appellant then challenged his conviction by petitions for post-conviction relief, including a petition for writ of error coram nobis filed in the court where the judgment now on appeal occurred. On an appeal from a denial of the petition, this Court, by a brief but comprehensive opinion, held that the defendant was entitled to an appeal of his conviction, reversed the judgment and remanded the case to the trial court with directions that “the petitioner be afforded an appeal.” Oliver v. State, Ala.Cr.App., 435 So.2d 207, 208, 209, (1983).
Appellant’s only contention for a reversal is the following:
“THERE WAS INSUFFICIENT EVIDENCE SUBMITTED AT TRIAL TO SUPPORT THE VERDICT OF GUILTY OF THE DEFENDANT.”
The alleged victim, whose name we refrain from calling, was ten years old at the time of the trial, nine years of age at the time of the alleged crime. She was the stepdaughter of the defendant. She and defendant were the only eyewitnesses to the incident upon which the prosecution was based. The defendant emphatically denied that he “did carnally know, or abuse in the attempt to carnally know” the alleged victim.
Dr. John Diplacido, an obstetrician, practicing his profession in Huntsville and on *1338 the faculty of the University of Alabama, testified that he examined the alleged victim in the Huntsville Hospital on February 20,1979, which according to the undisputed evidence was the Monday following the Saturday evening of the alleged crime. He testified:
“Q. Doctor, tell the jury, if you will, just what you did, what examination you conducted on [the child] at that time.
“A. I talked to the child for a good while trying to determine what had happened to her and then examined her generally and vaginally to attempt to see if any injuries had taken place and to see if there was any evidence of rape.
“All right. Did you examine her vagina? “A. Yes I did.
“Q. What, if anything, did you find in that examination?
“A. Her hymen was torn and bleeding at the time of the examination.
“Q. All right.
“A. That’s the structure immediately inside the vagina.
“Q. Were there any other physical injuries that you observed on or about her body?
“A. No, sir.
“Q. Doctor, from your examination, were you able to determine how old this injury was?
“A. Only that it was not more than two or three days old, in that general range. “Q. There was still some blood present, some bleeding?
“A. Yes, sir.
“Q. Doctor, would that injury, based upon your training and background in medicine, would that injury be consistent with something having been inserted in her vagina?
“A. Yes.”
According to the testimony of the alleged victim, she and her sister had been visiting at a friend’s house in the neighborhood where the victim lived with her mother and her stepfather, her brother and her sister, and while at the friend’s house her stepfather came for her and her sister and they returned with her stepfather to her home. She and her sister then went upstairs, and her sister went to sleep. Thereafter, her stepfather came upstairs and took the victim downstairs. She testified:
“A. And then he told me to get on the couch.
“Q. That was Robert Earl told you to get on the couch?
“A. Yes.
“Q. And what did you do at that point? Did he come up to get you upstairs, did he take you downstairs?
“A. Yes.
“Q. He took you downstairs and you got on the couch?
“A. Yes.
“Q. And where is the couch located? “A. Over on this side.
“Q. Well, is it in the living room?
“A. Yes.
“Q. And there is a TV in there?
“A. Yes.
[[Image here]]
“Q. And after he got you on the couch, did anything happen at that point?
“A. Yes.
“Q. What happened?
“A. He stuck his thing in me.
“Q. How did he do that? Did you have any pants on?
“A. No.
“Q. You didn’t have any pants on?
“A. No.
“Q. What happened to your pants?
“A. He pulled them down.
“Q. And did you have on your night gown?
“A. Yes.
“Q. You had on your nightgown and your pants?
“A. Yes.
*1339 “Q. When he did that, did it hurt you?
“A. Yes.
“Q. Did anything happen to you when he did that?
“A. Yes.
“Q. What happened?
“A. Blood.
“Q. How long did that happen? Did it last a long time, or was it short?
“A. A long time.
“Q. A long time?
“A. Yes.
“Q. Did you cry?
“A. No.
“Q. Did you ask him to stop?
“A. No.
“Q. Were you scared?
“A. Yes.
“Q. After he did that, what did you do?
“A. Went upstairs.
“Q. When you got upstairs, what did you do?
“A. Went in the bathroom.
“Q. And did you do anything in the bathroom?
“A. Washed up.
“Q. Do you know about what time this happened?
“A. No.
“Q. Well, was it late at night?
“A. Yes.
“Q. After you washed up, what did you do?
“A. Go to bed.
“Q. Did you talk to anybody that night?
“A. Yes.
“Q. Who did you talk to?
“A. My brother and sister.
“Q. And what did you tell them?
“A. The same thing.
“Q. You told them what he did?
“A. Yes.
“Q. And did they tell you to do anything?
“A. Yes.
“Q. What did they tell you to do?
“A. To tell my mother.
“Q. Did you tell your mother?
“A. Yes.
“Q. When did you tell her?
“A. When she came.
[[Image here]]
“Q. Can you tell us what he did any better than you have before?
“A. Yes.
“Q. What did he do?
“A. He stuck his thing in me.
“Q. ... [the first name of the witness], where did he stick you?
“A. In the middle part.
“Q. In the middle part?
“A. Yes.”
According to further testimony of the alleged victim, on Sunday, the next day, she played, and on the Monday following she went to school and while at school told her teacher; she was then taken to the principal’s office; afterwards police were informed of the situation, her aunt was called and the witness was taken to the hospital, where she was examined by Dr. Diplacido. There was testimony of other witnesses that corroborated that which has just been narrated in this paragraph as to what occurred at the school and at the hospital.
Appellant’s attorney emphasizes the lack of precision and specificity in the testimony of the alleged victim as to what the defendant did to her while she was on the couch downstairs. He especially decries the use of the word “thing,” and states in his brief: “It should be noted that nowhere in the record is there an explanation of what illegal act took place, nor is there a statement as to what ‘thing’ was stuck in her or where.” As there is some undesirable vagueness in the particular testimony, appellant’s criticism thereof is understandable and is not to be ignored. However, the lack of definiteness and precision in the *1340 questions asked the witness and the answers given by her is likewise understandable by reason of the proper effort on the part of counsel to avoid vulgarity and the inability of the child of such tender age to state with precision what was meant by the “thing” that defendant stuck in her and as to where in her that he stuck it. However, it becomes increasingly clear that by use of the pronoun, “his,” instead of the article “a,” or the article “an,” she was referring to something that was a part of his body as distinguished from some inanimate object that he may have owned or possessed. Any doubt as to what part of her body was referred to by her in her testimony as to what occurred is removed by the testimony of the physician who examined her. Even if the child had known what name to use for the “thing,” she was not speaking in an unknown tongue by the use of the particular word in referring to the object. In Webster’s New International Dictionary, Second Edition, we find the following as one of the meanings of the word:
“Thing
[[Image here]]
“12. Colloq., a_
“b. Something for which the name is not used because of forgetfulness, indifference, disdain, or the like;_” (emphasis supplied)
Although the defendant stoutly testified that no such incident as that described by his stepdaughter occurred, his wife expressed confidence in his innocence in her testimony, and there was some testimony by two visitors at the home of defendant and his wife and family on the night of the alleged crime to the effect that defendant borrowed a car of one of the visitors to go elsewhere for a while that night, we are fully convinced that the evidence presented a jury question as to defendant’s guilt. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.